IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD A. ROSS and FIELDSTONE
VENTURES, LLC, on their own behalf
and on behalf of all others similarly situated,

Plaintiffs,

v.

Civil Action No.: 2:21-cv-1585-WSS

EQT CORPORATION; EQT PRODUCTION
COMPANY; RICE DRILLING B, LLC;
VANTAGE ENERGY APPALACHIA LLC;
and VANTAGE ENERGY APPALACHIA II
LLC,

Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION[1]

---

[1] The Court originally set a page limit of 20 pages for this brief. During a call between counsel and the Court on May 12, 2025, the parties consented, and the Court agreed, to extend the page limit for this brief from 20 to 25 pages. The parties consented, and the Court agreed, to extend the same courtesy to the Defendants for their anticipated response in opposition to this filing.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD A. ROSS and FIELDSTONE
VENTURES, LLC, on their own behalf
and on behalf of all others similarly situated,

Plaintiffs,

v.

Civil Action No.: 2:21-cv-1585-WSS

EQT CORPORATION; EQT PRODUCTION
COMPANY; RICE DRILLING B, LLC;
VANTAGE ENERGY APPALACHIA LLC;
and VANTAGE ENERGY APPALACHIA II
LLC,

Defendants.

## **TABLE OF CONTENTS**

I.    Introduction ................................................................................................................. 1

II.   Factual Background ...................................................................................................... 3

    a.  The Plaintiffs ......................................................................................................... 3

    b.  EQT's Processes, Records, and Methodologies ................................................... 4

    c.  Pending Motion ..................................................................................................... 9

III.  The Proposed Class ...................................................................................................... 9

IV.   Argument ...................................................................................................................... 9

    A.  The Class satisfies the requirements of Rule 23(a) ............................................ 10

        i.    23(a)(1):  The Class satisfies numerosity ..................................................... 10
        ii.   23(a)(2):  The Class satisfies commonality ................................................. 11
        iii.  23(a)(3):  The Class satisfies typicality ....................................................... 12
        iv.   23(a)(4): The Class satisfies adequacy ........................................................ 14

    B.  The Class satisfies the requirements of Rule 23(b)(2) ....................................... 16

    C.  The Class satisfies the requirements of Rule 23(b)(3) ....................................... 18

        i.    The Class satisfies predominance ................................................................. 18

      ii.    The Class satisfies superiority ....................................................... 20

      iii.   The Class satisfies asceertainability .............................................. 21

V.    Conclusion ............................................................................................. 25

## **TABLE OF AUTHORITIES**

### **Cases**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................ 18

*Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) ...................................... 18, 21, 23

*Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) .............................................. 21

*Everly v. Shannopin Coal Co.,* 11 A.2d 700 (Pa. Super. Ct. 1940) ............................ 17

*Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349 (3d Cir. 2013) .................................. 21

*Hutchinson v. Sunbeam Coal,* 519 A.2d 385 (Pa. 1986) ........................................... 17

*In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation,*
      ......795 F.3d 380 (3d Cir. 2015) ................................................................... 20, 21

*In re National Football League Players Concussion Injury Litigation,*
      821 F.3d 410 (3d Cir. 2016).......................................................................... 12

*In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585 (3d Cir. 2009) ................... 13

*In re Suboxone Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) ................................... 14

*Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495 (3d Cir. 2014) .................... 10

*KEM Resources, LP v. Deer Park Lumber, Inc.,* 310 A.3d 142 (Pa. 2024) ................ 17

*Lancaster v. Flowers,* 57 A. 526 (Pa. 1904) ............................................................. 17

*McIntosh v. Ropp*, 82 A. 939 (Pa. 1912) ...............................................................2, 11

*Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467 (3d Cir. 2018)............... 10, 11

*Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) ........................................................... 14, 15

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)............... 12

*Nolt v. TS Calkins & Assocs., LP,* 96 A.3d 1042 (Pa. Super. Ct. 2014) ........................................ 17

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) .......................................................... 10

*Taha v. County of Bucks*, 862 F.3d 292 (3d Cir. 2017) ..................................................... 19

*Texas Keystone Inc. v. Pa. Dept. of Conservation and Natural Resources,*
    851 A.2d 228 (Pa. Commw. Ct. 2004) ........................................................... 16

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ..................................................... 18

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ................................................. 11, 12

**Rules**

Fed. R. Civ. P. 23 ..........................................................................................passim

**Statutes**

Class Action Fairness Act.................................................................................. 10-11

58 P.S. § 33.3 ..............................................................................................passim

68 P.S. § 101 ...................................................................................................... 17, 18

72 P.S. § 1301.9 ..................................................................................................... 24

**Secondary Sources**

Tenant in Common, Black's Law Dictionary (12th Ed., 2024)..................................................  2

C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778 (3d ed. 2005) .......... 18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RICHARD A. ROSS and FIELDSTONE VENTURES, LLC, on their own behalf and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>      v.<br><br>EQT CORPORATION; EQT PRODUCTION COMPANY; RICE DRILLING B, LLC; VANTAGE ENERGY APPALACHIA LLC; and VANTAGE ENERGY APPALACHIA II LLC,<br><br>        Defendants. | Civil Action No.: 2:21-cv-1585-WSS |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION[1]**

## I.      INTRODUCTION

The facts of this class action are simple. EQT extracts natural gas from natural gas owners without paying them. And EQT acknowledges its failure by setting aside money to pay the uncompensated owners in the event they come forward. They now come forward, asserting their right to payment under Pennsylvania statutory and common law.

In 2013, the Pennsylvania General Assembly amended the Guaranteed Minimum Royalty Act (the "Act") to guarantee all Pennsylvania landowners a one-eighth royalty of any natural gas extracted from their property. *See* 58 P.S. § 33.3. The Act remains good law and requires that natural gas producers like EQT pay the guaranteed royalty payment (the "Guaranteed Royalty")

---

[1] The Court originally set a page limit of 20 pages for this brief. During a call between counsel and the Court on May 12, 2025, the parties consented, and the Court agreed, to extend the page limit for this brief from 20 to 25 pages. The parties consented, and the Court agreed, to extend the same courtesy to the Defendants for their anticipated response in opposition to this filing.

to all owners of the extracted natural gas. What is more, Pennsylvania common law guarantees co-tenants a proportionate payment of the fair market value of their shared, extracted natural gas. *See McIntosh v. Ropp*, 82 A. 949, 954-955 (Pa. 1912) (recognizing that co-tenants are owed proportionate shares of the fair market value of extracted "minerals," which include oil and gas).

Under the Act and under Pennsylvania common law, therefore, a co-tenant[2] of property may execute a lease with a natural gas producer to allow the producer to drill for natural gas on the co-owned property, but, in exchange, the producer must provide the Guaranteed Royalty or the proportionate fair market value of the extracted natural gas (meaning, the net proceeds of the extracted gas allocated to a given interest), whichever is greater (collectively, "Guaranteed Payment"), to all co-tenants of the property – not just the leasing co-tenant. [3]

The principle underlying the Act and the common law is that private property may not be stolen from private property owners. Here, a natural gas producer cannot extract natural gas without compensating all the owners of that natural gas. But that is exactly what EQT has done to the Plaintiffs and the proposed class.

Plaintiffs Richard A. Ross and Fieldstone Ventures, LLC (collectively, "Plaintiffs") are tenants-in-common[4] with tenants who executed leases with EQT for the extraction of natural gas

---

[2] Co-tenants here are those who share an interest in mineral rights with one or more other individuals or entities. *See* Ex. 1 (Expert report of John Whipkey, p. 2).

[3] The Guaranteed Royalty, in this context, serves as a statutorily-created payment floor. To the extent that the proportionate fair market value of extracted natural gas exceeds the Guaranteed Royalty, the higher fair market value applies under Pennsylvania common law. *See McIntosh, supra*. These contingencies under the Guaranteed Payment are already accounted for and addressed by Plaintiffs' statistical analysis expert, Chris Haney. *See infra*.

[4] Tenants-in-common hold the same property by unity of possession but by separate title, with each person having an equal right to possess the whole property but no right of survivorship accruing to the other co-tenants. *See Tenant in Common, Black's Law Dictionary* (12th Ed., 2024).

on their tenancies in common. Plaintiffs, as unleased co-tenants, hold interests in natural gas that EQT has extracted, but they have never received their Guaranteed Payments for the extraction. Likewise, the proposed class members have suffered the same fate – a lack of compensation - at the hands of the same natural gas producer – EQT. This shared injustice arises from the same systemic transgression of the same Pennsylvania law. The action is thus apt for classwide disposition.

As this Court is well aware, the United States Supreme Court requires the Court to perform a "rigorous analysis" before certifying a class under Federal Rule of Civil Procedure 23. Following that rigorous analysis, the Court will see that the proposed class satisfies: the elements of numerosity, commonality, typicality, and adequacy under Federal Rule of Civil Procedure 23(a); the standard for injunctive relief under Rule 23(b)(2); and the elements of predominance, superiority, and ascertainability under Rule 23(b)(3).

The proposed class merits certification, and Plaintiffs respectfully request that the Court recognize that and grant this Motion.

## II.    FACTUAL BACKGROUND

### a.  The Plaintiffs

Plaintiff Richard A. Ross ("Mr. Ross") owns, as a co-tenant, the subsurface natural gas rights on 362 acres of land located in Greene County, Pennsylvania (the "Ross Property"). *See* Declaration of Richard A. Ross, ¶ 5. EQT has extracted natural gas from the Ross Property, but EQT Corporation, EQT Production Company, Rice Drilling B, LLC, Vantage Energy Appalachia LLC, or Vantage Energy Appalachia II, LLC (collectively, "EQT") have not executed a lease with Mr. Ross to drill for natural gas on the Ross Property. *See id*. at ¶ 6. At least one of Mr. Ross's co-tenants has executed a lease for EQT to drill for natural gas on the Ross Property, but EQT has not

paid Mr. Ross the Guaranteed Payment owed to him under the Act and/or Pennsylvania common law. *See id*. at ¶¶ 6-7.

Plaintiff Fieldstone Ventures, LLC ("Fieldstone") owns, as a co-tenant, the subsurface natural gas rights on 55 acres of land located in Greene County, Pennsylvania (the "Fieldstone Property"). *See* Declaration of Ian Dupre, as Managing Member of Fieldstone Ventures, LLC, ¶ 6. EQT has extracted natural gas from the Fieldstone Property, but EQT has not executed a lease with Fieldstone to drill for natural gas on the Fieldstone Property. *See id*. at 7-8. At least one of Fieldstone's co-tenants has executed a lease for EQT to drill for natural gas on the Fieldstone Property, but EQT has never paid Fieldstone the Guaranteed Payment owed to it under the Act and/or Pennsylvania common law. *See id*.

EQT's failure to pay Mr. Ross and Fieldstone their Guaranteed Payments is not an anomaly. EQT acknowledges that it has failed, and continues to fail, to pay the Guaranteed Minimum Royalties to all owners of natural gas (the putative class). *See* Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 30, 52-53, 58-59, 68, 208-210) (acknowledging that EQT seeks to lease, and therefore compensate, only ███████ of owners before extracting the owners' natural gas).

*b. EQT's Processes, Records, and Methodologies*

When EQT seeks to drill a natural gas well, it draws a "Unit" around the well or group of wells. *See* Ex. 2 (Dep. Tr. Corcoran, February 6, 2025, p. 53). The Unit makes up the geographic area on which the wells are placed, both above and below ground. *See* Ex. 3 (Dep. Tr., Anthony Gabbianelli, p. 16). The Unit is in turn made up of "parcel(s)," which are individual properties with unique tax parcel ID numbers. *See* Ex. 2 (Dep. Tr. Corcoran, April 16, 2025, p. 238).

EQT maintains records in the ordinary course of business that identify each parcel of land from which it extracts natural gas, and the corresponding ownership interests for each drilled

parcel. Ex. 2 (Dep. Tr. Patrick Corcoran, April 16, 2025, pp. 336). Before drilling for natural gas

on a given parcel, EQT conducts title research, or contracts with a third-party vendor like BOP

Abstract, LLC to conduct title research, to identify ownership of the parcel's natural gas. *See, e.g.*,

Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 352-354); Ex. 4 (Dep. Tr. Michael Rush, pp. 28-31, 49); Ex.

5 (Dep. Tr. BOP Abstract, LLC, pp. 27-28, 33-34). Part of the title research includes identifying

owners of natural gas who obtained their ownership interests as heirs to deceased owners. *See,*

*e.g.*, Ex. 4 (Dep. Tr. Michael Rush, 15-16, 186-187); Ex. 5 Dep. Tr. BOP Abstract, LLC, pp. 40,

98).

EQT requires that third-party vendors like BOP Abstract supply EQT with accurate

ownership information. *See* Ex. 5 (BOP Abstract Tr., p. 56, 73). EQT's Master Service Agreement

with BOP Abstract, LLC, for example, requires that title vendors like BOP Abstract perform their

work with "due diligence," in a "good and workmanlike manner," and "in accordance with the

standards, practices and procedures which would be reasonably expected from an experienced

service provider in the industry[.]" Ex. 6 (BOP MSA with EQT, § 7.10). According to BOP

Abstract, those professional standards include supplying accurate natural gas ownership

information to EQT for the parcels on which EQT drills. *See* Ex. 5 (Dep. Tr. BOP Abstract, p. 56,

73). EQT has been satisfied with BOP Abstract's efforts, retaining its services since 2018, even

though the MSA between the parties allows EQT to terminate BOP Abstract without cause. *See*

Ex. 6 (BOP MSA with EQT, § 6.1); Ex. 5 (Dep. Tr. BOP Abstract, pp. 51, 55). For its part, EQT's

chief land officer, Corey Peck, denies any knowledge of a "better" way to identify landowners

than the processes that EQT employs. *See* Ex. 7 (Dep. Tr. Corey Peck, p. 30).

EQT only pays royalties to owners with whom it has a lease, *see* Ex. 7 (Dep. Tr. Corey

Peck, pp. 34-35). EQT records its leases in a database called Quorum Land Systems, and the

Quorum database retains all details of each lease that EQT executes. *See* Ex. 2 (Dep. Tr. Patrick Corcoran, p. 27. EQT only aims to lease around ███████ of the ownership interests in the parcel's natural gas before drilling. *See* Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 30, 52-53, 58-59, 68, 208-210). EQT thus admits that it does not compensate all natural gas owners for the gas it extracts, though EQT does meticulously record all royalty payments that it pays to leased owners or should be paying to unleased owners.

EQT records all royalty payments it makes in a "Salesforce" database. *See* Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 33, 39). Cognizant that it does not pay the Guaranteed Payment to all interest holders, EQT places royalty payments owed to unleased, uncompensated interest holders in standalone "suspense accounts," which EQT reviews and updates at least annually. *See, e.g.*, Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 112, 122-123-); Ex. 4 (Dep. Tr. Michael Rush, pp. 65-66, 82); Ex. 3 (Dep. Tr. Anthony Gabbianelli pp. 65, 84, 166-167).

To date, EQT has produced data and documents detailing monthly natural gas production and natural gas ownership interests for the period of 2017 to 2023. Statistical analysis expert Christopher Haney has compiled these data and documents into a single, interactive database (the "Database"). *See* Ex. 8 (Expert Report of Christopher Haney, at p. 9). The Database is populated by more than 20 million records and 40 categories of information. *Id*. The data of EQT's suspense ledgers, which account for unleased natural gas owners and their unpaid royalties, are included in the Database. *Id*. at p. 11. The suspense ledger data include natural gas well names, unique owner numbers, codes identifying all unleased interests, quantity of the gas produced for a given property, the revenue earned for the gas produced in U.S. dollars on a given property, the costs associated with the product produced on a given property, and the net revenue interest held by owners of the natural gas extracted from a given property. *See id*. at p. 11.

In a single stroke, the Database can thus be searched to identify the following information for a given parcel of land from which EQT has extracted natural gas:

a.  Unleased owner's name;

b.  Unleased owner's owner number;

c.  Parcel Tax IDs for the parcel;

d.  Wells numbers for the parcel;

e.  Net Revenue Interests for the parcel;

f.  Quantity of gas production on the parcel;

g.  Revenue for gas production on the parcel;

h.  Deductions and withholdings for gas production on the parcel;

*Id*. at p. 13.

EQT data composing the Database identifies at least 5,455 unique unleased and uncompensated owners of natural gas that EQT has extracted in Pennsylvania. *See id*. at 5, 9, & 13. Using a sample size of 189 out of those 5,455 owners, Mr. Haney is certain (with 95 percent confidence) that the Database can presently be queried, in one sitting, to identify 68-81 percent of unleased and uncompensated natural gas owners. *See id*. at 14.[5]  From there, EQT's own data allows title examiners to comprehensively identify ownership for any given parcel of land that may or may not already be noted in Mr. Haney's Database, thus making any outstanding balance of Class members identifiable by title examiners.

---

[5] Fact discovery on the merits will remain ongoing beyond Class certification, and Plaintiffs anticipate continued efforts to obtain records beyond what EQT has been willing to produce to date. Plaintiffs anticipate that these additional records will only increase the percentage of identified (rather than merely identifiable) Class members.

Veteran title attorney John Whipkey confirms that title examiners, like himself, can substantially identify interest owners for a given parcel of land using standard, objective criteria maintained by EQT in the ordinary course of its business and produced by EQT in this action. *See* Ex. 1 p. 2. To the extent there are any gaps in EQT's ownership records, Mr. Whipkey or another qualified title examiner can readily fill them in. *See id*. Mr. Whipkey represents that he or any other qualified title examiner can utilize public records and databases, such as County records, ancestry.com, online and archived obituaries, and other routine tools of title examination to identify any outstanding members of the Class not already apparent on the face of EQT's own records. *See id*. at pp. 2-5). BOP Abstract confirms that such tools are standard and part of the daily toolkit of professional title examiners. Ex. 5 (Dep. Tr. BOP Abstract, LLC, p. 132). EQT's top land official, Mr. Peck, agrees that there is no "better" way to identify ownership than these methods. *See* Ex. 7 (Dep. Tr. Corey Peck, p. 30).

In addition to the mere identities of uncompensated, unleased natural gas owners, EQT details in its records the compensation owed to uncompensated, unleased natural gas owners. EQT sets aside amounts owed to the uncompensated, unleased natural gas owners on EQT drilled properties. EQT's Assistant Controller, Anthony Gabbianelli, has testified on behalf of EQT as follows: "We have them [the unleased owners] accounted for as a liability. And as a corporation, we have the financial means to pay them out if and when appropriate." Ex. 3 (Dep. Tr. Anthony Gabbianelli, pp. 175-176).

Mr. Haney agrees with Mr. Gabbianelli that the payments owed by EQT to the unleased, uncompensated owners are readily able to be identified and made, and Mr. Haney maintains that they are calculated using a straightforward, uniform method. The uniform method is the calculation of royalty payments owed to uncompensated, unleased owners based on the same equation used

by EQT and the same data provided by, or available to, EQT, all of which has been populated into Mr. Haney's Database and is illustrated in his report. *See* Ex. 8 (Expert Report of Chris Haney, pp. 15-18).

EQT has already deployed this uniform damages model, calculating outstanding royalties owed to unleased, uncompensated owners in an amount of ██████████ since 2018. [6] *Id*. at p. 18.

### c.  Pending Motion

Considering the foregoing, Plaintiffs seek to certify this Class to recover the Guaranteed Payments owed to them and the Class members – and already set aside by EQT for them – under Pennsylvania's Guaranteed Minimum Royalty Act and Pennsylvania common law governing unjust enrichment. *See generally* Dkt. 1, at Ex. 1 (Complaint).

## III.    THE PROPOSED CLASS

Plaintiffs seek to certify the following class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> All persons (natural or fictitious) who own interests or rights in real property situated in Pennsylvania as tenants-in-common with a co-tenant who entered into natural gas leases with Defendants, and whose property rights Defendants have violated by drilling for, extracting, and producing natural gas without payment, including but not limited to the minimum royalties guaranteed by Pennsylvania statute and common law (the "Class").

## IV.    ARGUMENT

Plaintiffs must satisfy Federal Rule of Civil Procedure 23(a) to pursue class certification. From there, Plaintiffs must satisfy Rule 23(b)(2) to obtain injunctive relief and Rule 23(b)(3) to

---

[6] This total of ██████████ is not the final total damages for the Class, as Plaintiffs reserve the right to seek additional records and develop further evidence on the merits that would increase this total calculation. Plaintiffs have also asserted a punitive damages claim that would increase the overall damages award in this action. The ██████████, however, illustrates that, at a minimum, EQT has already set aside ██████████ to pay uncompensated, unleased owners for the natural gas extracted from their property. The number is thus a floor, not a ceiling.

obtain monetary relief on a classwide basis. For the reasons set forth below, class certification is appropriate under each of these Rules.

**A. The Class satisfies the requirements of Rule 23(a).**

Rule 23(a) is satisfied when: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). The proposed Class meets each of these elements.

**i.    23(a)(1): The Class satisfies numerosity.**

Numerosity exists when a proposed class is so numerous that joinder is impracticable. Fed. R. Civ. P. 23(a)(1). There is no minimum number of plaintiffs required to form a class, but "a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing 'that the potential number of plaintiffs exceeds 40.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

As an initial matter, Defendants removed this action to federal court under the Class Action Fairness Act. *See* Dkt. 1, pp. 4-8. The Class Action Fairness Act confers jurisdiction on this Court so long as, among other requirements, the proposed class has at least 100 members. *See id*. at p. 4 (quoting *Judon v. Travelers Prop. Cas. Co. of Am.*, 773 F.3d 495, 500 (3d Cir. 2014) ("Under CAFA, district courts have original jurisdiction over class actions raising state law claims where: '(1) the amount in controversy exceeds $5,000,000, as aggregated across all individual claims; (2) any member of a class of plaintiffs is a citizen of a state different from any defendant; **and (3) the class has at least 100 members**.'") (emphasis added)) By definition, Defendants acknowledged in their notice of removal that, based on Plaintiffs' proposed class definition in their Complaint

and based upon a review of Defendants' records, the proposed Class satisfies CAFA's "100-member" requirement. *See id*. at p. 8.

Additionally, the contents of the more than 20 million records EQT produced that populate the Database reveal at least 5,455 class members. *See* Ex. 8 (Expert Report of Chris Haney, pp. 2, 9, 13).

The potential number of class members thus exceeds 40, and does so by more than 5,000. Numerosity is satisfied. *See Mielo*, 897 F.3d at 486.

### ii.    23(a)(2): The Class satisfies commonality.

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Specifically, "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Meaning, the class's claims "must depend upon a common contention… capable of classwide resolution" and a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Notably, "even a single common question will do" to satisfy commonality under Rule 23(a)(2). *Id*. Commonality is satisfied here.

A classwide proceeding will resolve each class members' claims against EQT in a single stroke. EQT's liability to each proposed Class member turns on whether EQT has extracted natural gas from Class members without compensating the Class members. The answer will either be yes or no, and is legally dispositive because EQT, as a matter of law, is strictly prohibited in Pennsylvania from extracting natural gas without paying all of its owners their Guaranteed Payments. *See* 58 P.S. § 33.3; *McIntosh v. Ropp*, 82 A. at 954-955. This "yes or no" – or, "true or

false" – answer can be derived by reference to shared evidence. That shared evidence is EQT's own meticulous records produced in this action, which have been populated into Mr. Haney's interactive Database. *See* Ex. 8 (Expert Report of Christopher Haney, at p. 9).

The claims for the Guaranteed Minimum Royalty of all 5,455 Class members identified in Mr. Haney's Database turn on a true or false answer that can be uniformly derived through classwide adjudication. Factually, each Class member shares a common factual question that leads to a single, common answer: Has EQT extracted natural gas from their properties without compensating them? The available evidence in this case supplies a common answer: Yes. Legally, each Class member shares a common question that leads to a single, common answer: Are the Class members entitled to be compensated under the Guaranteed Minimum Royalty Act for the natural gas EQT extracted from their property? Under Pennsylvania law, the answer is a resounding, collective "yes." Then, another legal question logically follows. Has EQT been unjustly enriched by taking and profiting from the private property of the 5,455 Class members? Again, a common, collectively dispositive answer follows: Yes. Whether factually or legally, there is nothing materially distinguishable about the claims of each Class member.

Commonality is satisfied. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350.

### iii.    23(a)(3): The Class satisfies typicality.

Typicality exists when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "ensures the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *In re National Football League Players Concussion Injury Litigation*, 821 F.3d 410, 427-428 (3d Cir. 2016) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182-183 (3d Cir. 2001)). Courts assess typicality by analyzing

"the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

The analysis involves three factors. First, "the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory." *Id*. Second, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Id*. Third, "the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id*. Each of these is met here.

First, Mr. Ross and Fieldstone's claims share the same material facts and advance the same legal theory as the members of the proposed Class. Factually, Mr. Ross and Fieldstone are co-tenants of tenancies in common – the Ross and Fieldstone Properties, respectively – from which EQT has extracted natural gas, but for which neither Mr. Ross nor Fieldstone have been compensated as required by the Guaranteed Minimum Royalty Act and Pennsylvania common law. *See* Declarations of Richard A. Ross and Ian Dupre of Fieldstone, *supra*. That is the exact factual circumstance of each proposed Class member. *See* Dkt., at Ex. 1, ¶ 44 (Class definition). *See also* § III ("The Proposed Class"), *supra*.

Second, neither Mr. Ross nor Fieldstone are subject to defenses that are inapplicable to many Class members or likely to become a major focus of this litigation.

Third, Mr. Ross and Fieldstone share the same interests and incentives as the members of the proposed Class. The claims of Mr. Ross, Fieldstone, and each Class member will all rise or fall together. As discussed under the analysis of commonality, an affirmative answer to whether EQT has extracted natural gas on Mr. Ross, Fieldstone, and each Class member's respective properties

will lead to the same result: EQT's liability to them under Pennsylvania statutory and common law. Mr. Ross and Fieldstone thus share every interest and incentive of the Class they seek to represent.

What is more, and as will be further discussed in the analysis of 23(b)(4), Mr. Ross and Fieldstone have already demonstrated their commitment to these shared interests. Mr. Ross and Fieldstone have actively engaged in the litigation since its inception and allowed themselves to be deposed in this case. *See, e.g.* Declaration of Richard A. Ross, ¶ 17; Declaration of Ian Dupre, ¶ 14. Mr. Ross and Fieldstone recognize what is apparent: Their claims are typical of the proposed Class.

Mr. Ross, Fieldstone, and the members of the proposed Class have experienced the same injustice – a lack of payment – at the hands of the same wrongdoer – EQT. All of this has transpired under the same legal framework – Pennsylvania statutory and common law. At bottom, Mr. Ross and Fieldstone challenge the same unlawful conduct under materially factual and legal circumstances as the members of the Class. *See Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement[.]").

Mr. Ross and Fieldstone's claims are typical of the Class. Typicality is satisfied.

### iv.    23(a)(4): The Class satisfies adequacy.

Adequacy exists when "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4). Adequacy serves to "uncover conflicts of interest between named parties and the class they seek to represent." *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020). The class representative need only "have a minimal degree of

knowledge about the case." *Id*. Accordingly, "[o]nly fundamental conflicts will defeat the adequacy requirement." *Id*.

Adequacy under Rule 23(a)(4) also addresses the adequacy of class counsel, who must be "experienced and qualified to prosecute the claims on behalf of the entire class." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). The court determines adequacy of class counsel by considering (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The class representatives and class counsel satisfy adequacy here.

**Class Representatives**. Mr. Ross and Fieldstone have been, and will continue to be, adequate representatives for the Class. Mr. Ross and Fieldstone have participated in the litigation since its inception. *See, e.g.*, Declaration of Richard A. Ross, ¶ 17; Declaration of Ian Dupre, ¶ 14. Mr. Ross and Fieldstone have actively engaged with case material and have verified extensive discovery throughout the litigation. *See id*. Both Mr. Ross and Fieldstone have sat for depositions in this case. *See id*. Mr. Ross and Fieldstone have been exemplary class representatives, and there is no indication that they have or will act against the interests of the Class. Adequacy of the class representatives is satisfied.

**Class Counsel**. Plaintiffs are requesting the appointment of William Pietragallo, II, of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, as lead counsel for the Class. Mr. Pietragallo and his firm are qualified for this appointment.

Since August 2024, Mr. Pietragallo and his law firm have associated with co-counsel Raines Feldman Littrell LLP, Quinn Logue LLC, and Keller Postman to identify, investigate, and

analyze the facts and law underlying this putative class action. *See* Declaration of William Pietragallo, II. Undersigned co-counsel are very familiar with these efforts and agree that they have played a crucial role in the continued development of this matter. *See* Declaration of Scott M. Hare.

Mr. Pietragallo and his firm's litigation experience is vast and includes a history of successfully litigating class actions and complex litigation for plaintiffs and defendants alike, including as lead class counsel in *Carol Rougvie, Marguerite Sinkler Gilder, Carolien Mansour, Melinda Mehigan, Fonda Kubiak, Kara Bell and Tiffany Bolton v. Ascena Retail Group, Inc., d/b/a Justice Stores and Tween Brands, Inc., d/b/a Justice Stores*, United States District Court for the Eastern District of Pennsylvania, No. 2:15-cv-00724, MDL Docket No. 2646. Mr. Pietragallo and his firm's extensive experience in complex litigation is further detailed in his Declaration and the resumes attached thereto. *See generally* Declaration of William Pietragallo, II.

Adequacy of Class counsel is satisfied.

**B.  The Class satisfies the requirements of Rule 23(b)(2).**

As a preliminary matter, this Court should certify the Class as one deserving declaratory and injunctive relief because EQT has engaged – and continues to engage – in a specific course of conduct that adversely affects the Class as a whole. EQT systematically fails to account for the Class members' rights to compensation under Pennsylvania statutory and common law.

When a natural gas producer executes a lease with a co-tenant, it steps into the shoes of the leasing co-tenant and must honor the rights of the other co-tenants who have not entered leases with it. *See Texas Keystone Inc. v. Pa. Dept. of Conservation and Natural Resources*, 851 A.2d 228, 237 n.12 (Pa. Commw. Ct. 2004) ("It is of course axiomatic that an assignee 'stands in the shoes' of the assignor and assumes the rights of the assignor.").

Where real property is owned by tenants in common, each co-tenant must account to the other for their respective pro-rata shares of income generated through the property. Under Pennsylvania law, "it shall be lawful for any one or more of said tenants in common, not in possession, to sue for and recover from such tenants in possession his or their proportionate part of the rental value of said real estate." 68 P.S. § 101. This law provides a co-tenant with the right to enforce an accounting for its interest in real property. *See KEM Resources, LP v. Deer Park Lumber, Inc.*, 310 A.3d 142, 147 (Pa. 2024). Moreover, this statute furnishes a co-tenant of real property who is not in possession with the right to "obtain an accounting of its share of the income received by the other tenant-in-common from the jointly owned property." *Id*. A co-tenant is thus guaranteed the right to an accounting for its pro-rata share of income generated from the real property. *See id*; *see also Lancaster v. Flowers*, 57 A. 526, 527-28 (Pa. 1904) (outlining that a co-tenant may recover a proportionate share of rent collected by the other co-tenant); *Everly v. Shannopin Coal Co.*, 11 A.2d 700, 707 (Pa. Super. Ct. 1940) (explaining that a mining company renting an undivided interest in coal underneath a tract of land was accountable to the tenant-in-common for the value in place of the mined coal and the rental value of the property). Leasing a mineral right is not a landlord-tenant conveyance, but rather a transfer of a substantive right. *See Nolt v. TS Calkins & Assocs., LP*, 96 A.3d 1042, 1046 (Pa. Super. Ct. 2014) (explaining that "using the term lease with regard to the conveyance of mineral rights is in some respects a misnomer because what is really involved is a transfer of an interest in real estate, the mineral in place") (quoting *Hutchinson v. Sunbeam Coal*, 519 A.2d 385, 387 n.1 (Pa. 1986)) (cleaned up).

EQT's business practices are unlawful because EQT will not account to unleased cotenants unless those cotenants execute a contract with EQT. *See* Ex. 7 (Dep. Tr. Corey Peck, p. 34-35 (stating that EQT will account for property owner's interests **if** EQT is able to come to an

agreement with the owner). EQT keeps all revenue until and unless the real property owner agrees to sign a lease. *See* Ex. 2 (Dep. Tr., Patrick Corcoran, p. 122 (explaining that royalties stay in suspense accounts until a lease has been executed between EQT and the real property owner)). Requiring a lease in lieu of an accounting violates 68 P.S. § 101. This Court should therefore declare that EQT's business practice is unlawful because EQT fails to provide an accounting to unleased cotenants.

### C. The Class satisfies the requirements of Rule 23(b)(3).

For a class to be certified under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The class must also satisfy the "implicit" requirement of "ascertainability," which is "narrow" and "only requires the plaintiff to show that class members can be identified." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 165 (3d Cir. 2015).

### i. The Class satisfies predominance.

Predominance is related to commonality under Rule 23(a)(2) but is a more demanding inquiry. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123-124 (3d

ed. 2005) (footnotes omitted)). Ultimately, predominance will be satisfied where "the moving party… show[s] that the 'essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence.'" *Taha v. County of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017). Predominance is satisfied here.

The same evidence and legal conclusions derived therefrom predominate over the entire Class. As detailed in the 23(a)(2) commonality analysis, *supra*, the same answer to the same questions will decide **every class member's claims** against EQT under Pennsylvania statutory and common law. EQT either has or has not extracted natural gas from unleased, uncompensated owners, which can be surmised from EQT's own detailed records and from basic statistical and title tools readily available in this matter. *See generally, e.g.*, Exs. 8 (Expert Report of Christopher Haney) & 1 (Expert Report of John Whipkey). Once the Court references this collective, comprehensive data, it can answer, in a single stroke, whether EQT is liable to the entire Class under Pennsylvania's Guaranteed Minimum Royalty Act and under the common law principles of unjust enrichment. Whether EQT extracted natural gas from natural gas owners without paying them is black and white and does not require individualized inquiries among the 5,455 Class members. Not only are these "common, aggregation-enabling" issues more prevalent than "non-common, aggregation-defeating, individual issues," the "common, aggregation-enabling" issues are the only issues in dispute. The essential elements of each Class member's claims under Pennsylvania statutory and common law can be proven at trial without resort to nuanced, individualized evidence or mini-trials. *Taha*, 862 F.3d at 308. The same natural gas that EQT takes warrants the same compensation value. The only difference may be the quality of the natural gas taken, but not the dollar value and to whom that dollar value is owed. Overall, therefore, what unites the Class factually and legally predominates over anything that could be said to divide it.

Predominance is satisfied.

### ii.    The Class satisfies superiority.

Superiority exists when a class action is superior, "in terms of fairness and efficiency," to "alternative available methods of adjudication." *In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d 380, 408 (3d Cir. 2015). The Court considers "a non-exhaustive list of factors to consider in determining superiority, including: (1) the class members' interest in individually controlling the prosecution of separate actions; (2) the extent and nature of any similar litigation already commenced by class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Id*. at 408-409 (citing Fed. R. Civ. P. 23(b)(3). Superior is met here.

First, the Class members likely lack an incentive to control the prosecution of the more than 5,000 smaller actions. It is also likely that not all Class members, or even many of them, are aware of the claims they have against EQT for EQT's failure to pay them what they are owed under Pennsylvania law. Second, to counsel's knowledge, similar litigation is not pending against EQT in Pennsylvania. Third, it is highly desirable to concentrate this action in a single forum. The action affects more than 5,000 unleased, uncompensated property owners whose property EQT has taken without payment of the required royalties under Pennsylvania law. EQT operates a sophisticated, large-scale business that entails the generation of tens of millions of records populated by various fields of data. *See generally* Ex. 8 (Expert Report of Christopher Haney). While that data can be – and has been – simplified and accessible to a statistical expert like Mr. Haney, requiring each individual Plaintiff to request, comb through, and decipher that data would be an overwhelming burden to the individual, especially where, as here, the same applicable facts

and law predominate over the entire Class. Fourth, resolution of these matters on a classwide basis promotes simplicity and efficiency of management. The evidence has been collected, analyzed, and synthetized by qualified counsel and qualified experts. The synthetized evidence can be referenced by the Court to, in a single stroke, answer the predominate factual and legal questions that will resolve the claims of all Class members. Adjudication of these claims on a classwide basis will thus reduce difficulties of management for the Court and the Class members, not increase them.

Superiority is satisfied.

### iii.    The Class satisfies ascertainability.

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). "The ascertainability requirement consists of nothing more than these two inquiries. And it does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Id*. (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013) (emphasis in original)). A key question is whether "extensive and individualized fact-finding or mini-trials" will be necessary to identify the class members. *See In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*, 795 F.3d at 396. If not, the evidence weighs in favor of ascertainability. *See id*. Here, the class is ascertainable.

First, the Class is defined with reference to objective criteria. Broken down, the Class covers those persons, natural or fictitious, who:

(1) Own interest in real property situated in Pennsylvania;

(2) As tenants-in-common;

(3) With a co-tenant who entered into a natural gas lease with EQT; and

(4) Whom EQT has not paid for the gas that EQT extracted from the tenancy in common.

Each of these criteria is objective. A person either owns a given property or it does not. The Class does not contemplate "nice" property, "handsome" property," "valuable" property, or "expensive" property. It contemplates property, the ownership of which is an objective "yes or no" inquiry.

A tenancy in common is an objectively recognized category of private property ownership. Using the category of tenancy in common in the Class definition is thus an objective legal classification with a specific, recognized meaning under Pennsylvania law.

EQT stores and maintains all leases and the details thereof that it executes with co-tenants of private property from which it extracts natural gas. *See* Ex. 2 (Dep. Tr. Patrick Corcoran, p. 27). The existence of the leases, and the details thereof, are thus objectively verifiable.

EQT records and maintains data detailing the payments it has made to owners of the natural gas that it has extracted in Pennsylvania. *See* Ex. 2 (Dep. Tr. Patrick Corcoran, pp. 33, 39). EQT stores this information in a "Salesforce" database and has produced the data in this action. *See, e.g.*, *id*.; Ex. 8 (Expert Report of Chris Haney, p. 9). EQT itself has provided the data to objectively assess which owners it has paid and, by extension, which owners it has not paid.

The class is defined with objective criteria.

Second, a reliable and administratively feasible mechanism exists to identify the Class members, as detailed by Mr. Haney in his expert report. That mechanism is a single, interactive Database built with EQT's own undisputed data. And to the extent any closing touches are needed

to finalize the construction of Class membership beyond Mr. Haney's Database, title expert John Whipkey has explained how that would be done using basic, ordinary tools of property title, of the sort that professionals like him use every day.

To start, no party, including EQT, disputes that EQT's voluminous internal data is reliable. *See* Ex. 7 (Dep. Tr. Corey Peck, p. 24) Plaintiffs accept that EQT is not profiting billions of dollars through the practice of fabricating its own data, and unless EQT wishes to contest otherwise, the data that EQT provided in this action about production, accounting, and natural gas ownership can be deemed to be reliable.

Crediting EQT's data as reliable, Plaintiffs retained veteran statistical and title experts to explain what can be derived from EQT's data. The statistical expert, Christopher Haney, compiled EQT's data into a single, interactive Database. *See* 8 (Expert Report of Christopher Haney, p. 9). That database can already be searched to locate, with 95 percent confidence, all identifying information for 68 to 81 percent of those falling within the Class definition. *See id*. at pp. 14-15. At present, without further information that will inevitably come out in the lead up to, and during, trial, a significant majority of the Class not only **can** be identified – which is all that ascertainability requires – but **has already been** identified. *See Byrd*, 784 F.3d at 163.

For the remaining minority of Class members, title examiners such as John Whipkey can take any parcel of land – all of which are identified in EQT's records – to trace any remaining interests in that property to identify previously unidentified Class members. *See generally* Ex. 1 (Expert Report of John Whipkey). This title work is not individualized. *Id*. at 4. Mr. Whipkey and EQT's own Pennsylvania title vendor, BOP Abstract, LLC, agree that title examiners draw from the same standard toolbelt – which includes county land records and online, publicly available ancestry and genealogically resources – to identify property owners for a given parcel of land.

*Compare id*. at 2-5, *with* Ex. 5 (Dep. Tr. BOP Abstract, LLC, p. 132). EQT's top land official, Corey Peck, also agrees that there is no better way to conduct this work. *See* Ex. 7 (Dep. Tr. Corey Peck (Rough), pp. 26-27).

Any claim that these methods cannot identify all relevant natural gas owners would stand in direct conflict with the Pennsylvania Minimum Guaranteed Royalty Act and the Pennsylvania common law. The Act does not require that ▮▮▮▮ of owners be compensated (as EQT's conduct suggests), or even 99 percent be compensated. It requires **all** owners to be duly compensated. *See* 58 P.S. § 33.3. The aforementioned statistical and title methods and mechanisms fulfill that statutory mandate and do so in an administratively feasible fashion. Otherwise, the common law and Minimum Guaranteed Royalty Act would be effectively nullified, in violation of the judgment of Pennsylvania's judiciary, the will of Pennsylvania's legislature, and, by extension, its people.

As a final note, any unclaimed royalty payments owed to owners of natural gas that EQT extracts could be paid into a Court administered fund and, if those royalties go unclaimed after 5 years, the royalties would escheat to the Commonwealth of Pennsylvania. *See* 72 P.S. § 1301.9. Ultimately, then, if any Class members remain unidentified, the Commonwealth of Pennsylvania would assume the rights to their unclaimed royalties. At that point, the Commonwealth would round out the Class as the final class member.[7]

Ascertainability is satisfied.

---

[7] The Commonwealth would serve as a fictitious person, consistent with the proposed definition of the Class. *See* Dkt., Ex. 1, ¶ 44 (Class definition). *See also* § III ("The Proposed Class"), *supra*.

## V.    CONCLUSION

EQT admits that it owes compensation to the uncompensated owners of the natural gas it extracts in Pennsylvania, and EQT has set aside funds to pay that compensation in the event that the uncompensated come forward. They now come forward, and respectfully request that the Court certify them as a Class to collectively vindicate their rights under Pennsylvania law.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

*/s/ William Pietragallo, II*
William Pietragallo, II
PA ID: 16413
412-263-1818
wp@pietragallo.com
P. Brennan Hart
PA ID: 18123
412-263-4347
pbh@pietragallo.com
Matthew R. Barnes
PA ID: 328771
412-263-1842
mrb@pietragallo.com

One Oxford Centre, Floor 38
Pittsburgh, PA 15219

*Counsel for Plaintiffs*


RAINES FELDMAN LITTRELL LLP

Scott M. Hare
PA ID: 63818
share@raineslaw.com
Anthony T. Gestrich
PA ID: 325844
agestrich@raineslaw.com
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
*Co-counsel for Plaintiffs*

QUINN LOGUE LLC

Matthew T. Logue
PA ID: 87415
412-765-3800
matt@mattlogue.com
200 First Avenue, Third Floor
Pittsburgh, PA 15222
*Co-counsel for Plaintiffs*


KELLER POSTMAN LLC

Alex J. Dravillas (*Pro Hac Vice*)
150 N. Riverside Plaza, Suite 4470
Chicago, IL 60606
ajd@kellerpostman.com
*Co-counsel for Plaintiff*