IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD A. ROSS and FIELDSTONE
VENTURES, LLC, on their own behalf
and on behalf of all others similarly situated,

        Plaintiffs,

     v.

EQT CORPORATION; EQT PRODUCTION
COMPANY; RICE DRILLING B, LLC;
VANTAGE ENERGY APPALACHIA LLC;
and VANTAGE ENERGY APPALACHIA II
LLC,

        Defendants.

Civil Action No.: 2:21-cv-1585-WSS

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>AMENDED MOTION FOR CLASS CERTIFICATION</u>**

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION ................................................................................................... 1

II.   FACTUAL BACKGROUND .................................................................................. 3

III.  THE PROPOSED CLASS ....................................................................................10

IV.   ARGUMENT ........................................................................................................10

    A.    The Class satisfies the requirements of Rule 23(a)...................................10

        1.   23(a)(1): The Class satisfies numerosity.........................................11

        2.   23(a)(2): The Class satisfies commonality ......................................11

        3.   23(a)(3): The Class satisfies typicality ...........................................13

        4.   23(a)(4): The Class satisfies adequacy ...........................................15

    B.    The Class satisfies the requirements of Rule 23(b)(2)..............................17

    C.    The Class satisfies the requirements of Rule 23(b)(3)..............................19

        1.   The Class satisfies predominance .....................................................20

            a.   The Class shares a uniform damages model ...............................21

            b.   The individualized defenses would not undermine predominance...........22

        2.   The Class satisfies superiority .........................................................23

        3.   The Class satisfies ascertainability...................................................25

            a.   The Class is defined using objective criteria ............................25

            b.   Mr. Haney's interactive database, supplemented by standardized tools of title, provides a reliable and administratively feasible mechanism to ascertain class membership ...............................................27

V.    CONCLUSION......................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ........................................................................................................ 20, 23

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015) ...................................................................................... 20, 25, 28

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) .................................................................................................. 25

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................................................................ 21

*Hayes v. Wal-Mart Stores, Inc.*,
  725 F.3d 349 (3d Cir. 2013) .................................................................................................. 25

*In re Community Bank of Northern Virginia Mortg. Lending Practices Litigation*,
  795 F.3d 380 (3d Cir. 2015) ............................................................................................ 24, 25

*In re National Football League Players Concussion Injury Litigation*,
  821 F.3d 410 (3d Cir. 2016) ............................................................................................ 13, 22

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ............................................................................................ 13, 23

*In re Suboxone Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) .................................................................................................. 15

*In re: Google Inc. Cookie Placement Consumer Privacy Litig.*,
  934 F.3d 316 (3d Cir. 2019) .................................................................................................. 24

*KEM Resources, LP v. Deer Park Lumber, Inc.*,
  310 A.3d 142 (Pa. 2024) .................................................................................................. 18, 19

*McIntosh v. Ropp*,
  82 A. 949 ................................................................................................ 2, 9, 12, 17, 21

*Mielo v. Steak 'n Shake Operations, Inc.*,
  897 F.3d 467 (3d Cir. 2018) .................................................................................................. 11

*Neal v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ................................................................. 15

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ............................................................. 13

*Sciotto v. Sciotto*,
   288 A.2d 822 (Pa. 1972) ................................................................... 18

*Stewart v. Abraham*,
   275 F.3d 220 (3d Cir. 2001) ............................................................. 11

*Taha v. County of Bucks*,
   862 F.3d 292 (3d Cir. 2017) ............................................................. 20

*Texas Keystone Inc. v. Pa. Dept. of Conservation and Natural Resources*,
   851 A.2d 228 (Pa. Commw. Ct. 2004) ............................................... 1

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) .............................................................. 20, 22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................... 11, 12, 18

**Statutes**

58 P.S. § 33.3 .............................................................................. 2, 12, 21

58 P.S. § 701.4 ...................................................................................... 29

68 P.S. § 101 ................................................................... 1, 18, 19, 24

**Rules**

Federal Rule of Civil Procedure 23 ................................................  passim

**Other Authorities**

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778
   (3d ed. 2005) ................................................................................. 20

# I.    INTRODUCTION[1]

It is not EQT's money at issue.

"We recognize that these are amounts that are not EQT - - you know, collectively, whichever entity you want to talk about - - these are not EQT's property and that we owe them to a third party. We have them accounted for as a liability. And as a corporation, we have the financial means to pay them out if and when appropriate." Ex. 3, Dep. Tr., Anthony Gabbianelli, EQT Corporate Designee ("Gabbianelli Tr."), at 175:19-25.

"[W]e owe a duty to account for them." Ex. 2, Dep. Tr., Patrick Corcoran, EQT Corporate Designee ("Corcoran Tr."), at 379:06-08; *see* ECF No. 17, Affirmative Defense 6 (admitting that EQT owes Plaintiffs and the putative class an accounting).

Defendants concede they owe money, and we are here to secure just and expedient delivery to its rightful owners – the proposed class.

EQT extracts natural gas from natural gas owners without paying them. EQT acknowledges its failure by setting aside money to pay the uncompensated owners in the event they come forward. They now come forward, asserting their right to payment under Pennsylvania law.

When an energy producer leases with a co-tenant, the producer steps into the shoes of the co-tenant and is required to provide the other co-tenants with both an accounting and payment of monies owed to them. *See* 68 P.S. § 101; *Texas Keystone Inc. v. Pa. Dep't of Conservation & Nat. Res.*, 851 A.2d 228, 237 n.12 (Pa. Commw. Ct. 2004) ("It is of course axiomatic that an assignee 'stands in the shoes' of the assignor and assumes the rights of the assignor.")

---

[1] As used herein, "Mr. Ross" refers to Plaintiff Richard A. Ross, "Fieldstone" refers to Plaintiff Fieldstone Ventures, LLC, and "EQT" refers to Defendants.

Unleased co-tenants in Pennsylvania are owed a proportionate payment of the fair market value of the shared natural gas extracted from their property. *See McIntosh v. Ropp*, 82 A. 949, 954-55 (Pa. 1912) (a time honored, and oft cited, case recognizing that co-tenants are owed proportionate shares of the fair market value of extracted "minerals," which include oil and gas). *McIntosh* provides a principle of Pennsylvania law so valid that it has withstood the passage of time. And, at a minimum, Pennsylvania's Guaranteed Minimum Royalty Act guarantees all Pennsylvania landowners a one-eighth royalty of any natural gas extracted from their property. *See* 58 P.S. § 33.3.

Pennsylvania law therefore entitles out-of-possession co-tenants to be made whole for their proportional share of the value of natural gas extracted (the "Guaranteed Payment"). *See McIntosh*, 82 A. at 954-55. Here, EQT has already booked and accrued a royalty share for an unleased interest, including by placing the proceeds attributed to such interest onto its own ledgers, known as a suspense ledger, and treating it as a liability it plans to pay. EQT's own accounting already establishes the minimum amount owed to the uncompensated owners composing this class. And EQT has identified the uncompensated owners in a manner that EQT says could not have been done better.

Defendants' suspense ledger produced in this action already identifies $██████ of unpaid funds to unleased co-tenants. But the value of money owed to the proposed class far exceeds that amount. In their suspense ledger, Defendants improperly discounted the fair market value of the natural gas by ████████, leaving only ████████ of the fair market value on the ledger (i.e., Defendants have already pocketed the other ████████). Therefore, the true fair market value of the unpaid funds to the proposed class is at least $████████.

The fundamental principle here is that private property may not be taken from private property owners. That principle dictates that a natural gas producer cannot extract natural gas without providing an accounting to the unleased owners and compensating them for their share of the extracted property. But EQT systematically fails to do either of these things to the Plaintiffs' and the putative class's detriment. Plaintiffs therefore bring this class action under Rule 23(b)(2) to obtain an accounting and declaratory and injunctive relief, and under Rule 23(b)(3) to recover monetary damages.

Following the required rigorous analysis, the Court will see that the proposed class satisfies the elements of numerosity, commonality, typicality, and adequacy under Federal Rule of Civil Procedure 23(a), the standard for declaratory and injunctive relief under Rule 23(b)(2), and the elements of predominance, superiority, and ascertainability under Rule 23(b)(3).

The proposed class merits certification. Plaintiffs respectfully request that the Court recognize that and grant this Motion.

## II.    FACTUAL BACKGROUND

### A.  The Plaintiffs

Mr. Ross owns, as a co-tenant,[2] natural gas mineral estates on 362 acres of land located in Greene County, Pennsylvania (the "Ross Property"). *See* Declaration of Richard A. Ross, ¶ 5. EQT has extracted, and continues to extract, natural gas from the Ross Property, but EQT has not executed a lease with Mr. Ross for some of those natural gas mineral estates. *See id*. at ¶ 6. At least one of Mr. Ross's co-tenants has executed a lease for EQT to drill for natural gas on the Ross

---

[2] Tenants-in-common hold the same real property by unity of possession but by separate title, with each person having an equal right to possess the whole property but no right of survivorship as to the property rights accruing to the other co-tenants. *See Tenant in Common, Black's Law Dictionary* (12th Ed., 2024).

Property, but EQT has neither provided Mr. Ross an accounting, nor paid Mr. Ross the Guaranteed Payment, owed to him under Pennsylvania law. *See id*. at ¶¶ 6-7.

Fieldstone owns, as a co-tenant, the natural gas mineral estate on 55 acres of land located in Greene County, Pennsylvania (the "Fieldstone Property"). *See* Declaration of Ian Dupre, Managing Member of Fieldstone Ventures, LLC, ¶ 6. EQT has extracted, and continues to extract, natural gas from the Fieldstone Property, but EQT has not executed a lease with Fieldstone for that natural gas mineral estate. *See id*., ¶¶ 7-8. At least one of Fieldstone's co-tenants has executed a lease for EQT to drill for natural gas on the Fieldstone Property, but EQT has neither provided Fieldstone an accounting, nor paid Fieldstone the Guaranteed Payment, owed to it under Pennsylvania law. *See id*.

EQT's failure to account to and pay Mr. Ross and Fieldstone their Guaranteed Payments is not an anomaly. EQT acknowledges that it has failed, and continues to fail, to account to and pay the Guaranteed Payments to unleased owners of natural gas in Pennsylvania. *See* Ex. 2, Corcoran Tr., at 30, 52-53, 58-59, 68, 208-10 (acknowledging that EQT seeks to lease, and therefore compensate, at least █████████ of owners before extracting the owners' natural gas).

## B.  EQT's Processes, Records, and Methodologies

When EQT seeks to drill a natural gas well, it draws a "Unit" around the planned well or group of wells. *See* Ex. 2, Corcoran Tr., at 53. The Unit makes up the geographic area on which the wells are placed, both above and below ground. *See* Ex. 3, Gabbianelli Tr., at 16. The Unit comprises "parcel(s)," which are individual properties with unique tax parcel ID numbers. *See* Ex. 2, Corcoran Tr., at 238.

EQT maintains records in the ordinary course of business that identify each parcel of land within a Unit from which it extracts natural gas, and the corresponding ownership interests for

each drilled parcel. Ex. 2, Corcoran Tr., at 336. Before drilling for natural gas in a Unit, EQT conducts title research, or contracts with a third-party vendor like BOP Abstract, LLC ("BOP") to conduct title research, to identify ownership of the parcel's natural gas. *See, e.g.*, Ex. 2, Corcoran Tr., at 352-54; Ex. 4, Dep. Tr., Michael Rush, EQT Corporate Designee ("Rush Tr."), at 28-31, 49; Ex. 5, Dep. Tr., BOP Abstract, LLC ("BOP Tr."), at 27-28, 33-34. Part of the title research includes identifying owners of natural gas who obtained their ownership interests as heirs to deceased owners. *See, e.g.*, Ex. 4, Rush Tr., at 15-16, 186-87; Ex. 5, BOP Tr., at 40, 98.

EQT requires that third-party vendors like BOP supply EQT with accurate and reliable ownership information. *See* Ex. 5, BOP Tr., at 56, 73. EQT's Master Service Agreement with BOP Abstract, LLC, for example, requires that title vendors like BOP Abstract perform their work with "due diligence," in a "good and workmanlike manner," and "in accordance with the standards, practices and procedures which would be reasonably expected from an experienced service provider in the industry." Ex. 6, Master Temp. Staffing Servs. Agreement for Land Contractors Between EQT Prod. Co. & BOP ("EQT-BOP MSA"), § 7.10. According to BOP, those professional standards include supplying accurate natural gas ownership information to EQT for the parcels on which EQT drills. *See* Ex. 5, BOP Tr., at 56, 73. EQT has been satisfied with BOP's efforts and has utilized BOP's services since 2018, even though the EQT-BOP MSA allows EQT to terminate BOP without cause. *See* Ex. 6, EQT-BOP MSA, § 6.1; Ex. 5, BOP Tr., at 51, 55. For its part, EQT's chief land officer, Corey Peck, denies any knowledge of a "better" way to identify landowners than the processes that EQT employs. *See* Ex. 7, Dep. Tr., Corey Peck ("Peck Tr."), at 30.

EQT only pays royalties to owners with whom it has a lease. *See id.* at 34-35. EQT records its leases in a database called Quorum Land Systems, and the Quorum database retains all details

of each lease that EQT executes. *See* Ex. 2, Corcoran Tr., at 27. EQT aims to lease at least ▮▮ ▮▮▮▮▮ of the entire ownership interests in the parcel's natural gas before drilling. *See* Ex. 2, Corcoran Tr., at 30, 52-53, 58-59, 68, 208-10. EQT thus admits that it does not compensate all natural gas owners for the gas it extracts, though EQT does meticulously record all royalty payments that it actually pays to leased owners and believes it should pay to unleased owners. EQT likewise fails to provide an accounting to the unleased owners, despite EQT conceding that EQT has "a duty to account for them [the unleased owners]." *See id.* at 397:06-08.

EQT documents all royalties owed in a "Salesforce" database. *See* Ex. 2, Corcoran Tr., at 33, 39. Cognizant that it does not account to or pay the Guaranteed Payment to all interest holders, EQT places payments owed to unleased, uncompensated interest holders in standalone "suspense accounts," which EQT owns and reviews and updates at least annually. *See, e.g.*, Ex. 2, Corcoran Tr., at 112, 122-23; Ex. 3, Gabbianelli Tr., at 65, 84, 166-67; Ex. 4, Rush Tr., at 65-66, 82.

To date, EQT has produced data and documents detailing monthly natural gas production and natural gas ownership interests for the period of 2017 to 2023. Statistical analysis expert Christopher Haney has compiled these data and documents into a single, interactive database (the "Database"). *See* Ex. 8, Expert Report of Christopher L. Haney, CPA, CFE, CHC ("Haney Report"), at 9.[3] The Database is populated with more than 20 million records and 40 categories of information. *Id*. The data of EQT's suspense ledgers, which account for unleased natural gas owners and their unpaid royalties, are included in the Database. *Id*. at 11. The suspense ledger data include natural gas well names, unique owner numbers, codes identifying all unleased interests,

---

[3] The parties, with the Court's approval, previously conferred about confidentiality concerns and Plaintiffs ultimately filed a redacted and unredacted version of Mr. Haney's report on May 30, 2025. *See* ECF Nos. 100, 101, 111-9, 112-9. Mr. Haney's redacted report is attached hereto as Exhibit 8, and the unredacted version, which is expressly incorporated herein, can be found under seal at ECF No. 112-9.

quantity of the gas produced for a given property, the revenue earned for the gas produced in U.S. dollars on a given property, the costs associated with the product produced on a given property, and the net revenue interest held by owners of the natural gas extracted from a given property. *See id.*

In a single stroke, the Database can be searched to identify the following information for a given parcel of land from which EQT has extracted natural gas:

a. Unleased owner's name;

b. Unleased owner's owner number;

c. Parcel Tax IDs for the parcel;

d. Wells numbers for the parcel;

e. Net Revenue Interests for the parcel;

f. Quantity of gas production on the parcel;

g. Revenue for gas production on the parcel; and

h. Deductions and withholdings for gas production on the parcel.

*Id.* at p. 13.

The EQT data within the Database identifies at least 5,455 unique unleased and uncompensated owners of natural gas extracted by EQT in Pennsylvania. *See id.* at 5, 9, 13. Using a sample size of 189 out of those 5,455 owners, Mr. Haney is certain (with 95 percent confidence) that the Database can presently be queried, in one sitting, to identify 68-81 percent of unleased and uncompensated natural gas owners. *See id.* at 14. From there, EQT's own data allows title examiners to comprehensively identify ownership for any given parcel of land that may or may not already be noted in Mr. Haney's Database, thus making any outstanding balance of class members reliably and feasibly identifiable by title examiners.

Veteran title attorney and abstractor Cara Davis confirms that title examiners, like herself, can substantially identify owners of a given parcel of land using ordinary, objective metrics tracked by EQT in the ordinary course of its business and produced by EQT in this action. *See* Ex. 1, Expert Report of Cara C. Davis, Esq. ("Davis Report"), at 2 ("Based on the materials provided, it is my opinion that EQT's practices and collected data offer a sufficient foundation to identify the unleased heirs and/or unleased co-tenants. I believe this information can be effectively used to further develop and precisely locate these individuals."). To the extent there are any gaps in EQT's ownership records, a qualified title examiner can reliably fill them. *See id*. Ms. Davis represents that she or any other qualified title examiner can utilize public records and databases, such as County records, ancestry.com, online and archived obituaries, and other routine tools of title examination to identify any outstanding members of the class not already apparent on the face of EQT's own records. *See id*. at 4.

BOP confirms that such tools are standard and part of the daily toolkit of professional title examiners. Ex. 5, BOP Tr., at 132. EQT's top land official, Corey Peck, agrees that there is no "better" way to identify ownership than through these methods. *See* Ex. 7, Peck Tr., at 30. So, too, does John Whipkey, Plaintiffs' prior title expert. Ms. Davis' opinion is consistent with the statements set forth in Mr. Whipkey's expert report, the contents of which remain of record.[4] *See* Ex. 1, Davis Report, at 4 ("I have also reviewed the expert report of John Whipkey, Esq., and I find his analysis and opinions to be consistent with my own."); ECF No. 111-2 (Redacted Whipkey Report); ECF No. 112-2 (Sealed Unredacted Whipkey Report).

In addition to the identities of uncompensated, unleased natural gas owners, EQT admits and details in its records a minimum level of compensation owed to such uncompensated, unleased

---

[4] The contents of Mr. Whipkey's report are expressly incorporated as if fully set forth herein.

natural gas owners. Strikingly, EQT, through the testimony of its Assistant Controller and corporate designee, Anthony Gabbianelli, has admitted that EQT retains money that doesn't belong to it and is owed to the unleased owners: "We recognize that these are amounts that are not EQT… these are not EQT's property and that we owe them to a third party. We have them accounted for as a liability. And as a corporation, we have the financial means to pay them out if and when appropriate." Ex. 3, Gabbianelli Tr., at 175:19-25.

Mr. Haney agrees with Mr. Gabbianelli that the minimum payments owed by EQT to the unleased, uncompensated owners are readily identifiable, and Mr. Haney maintains that they are calculated using a straightforward, uniform method. The uniform method is the calculation of payments owed to uncompensated, unleased owners based on the same equation used by EQT and the same data provided by, or available to, EQT, all of which have been populated into Mr. Haney's Database as illustrated in his report. *See* Ex. 8, Haney Report, at 15-18.

EQT has already deployed this uniform damages model, admitting outstanding royalties owed to unleased, uncompensated owners in an amount of at least $██████████.[5] *Id*. at 18.

### C. Pending Motion

Considering the foregoing, Plaintiffs seek to certify a class to obtain a full accounting and to recover the Guaranteed Payments owed to the class under Pennsylvania law. *See generally* ECF No. 1-1 (Complaint).

---

[5] This total of $██████████ is not the final damages amount for the Class. The $██████████ reflects what EQT has already admitted in its ledgers relating to the unleased, uncompensated owners (excluding accrued interest). Under *McIntosh, supra*, EQT owes the unleased owners the 100 percent fair market value of their proportionate share of the natural gas extracted. The actual compensatory damages, excluding accrued interest, are at least ███████████████████████ ███████████████████████.

## III.    THE PROPOSED CLASS

Plaintiffs seek to certify the following class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> All persons (natural or fictitious) who owned a real property interest in a natural gas mineral estate in Pennsylvania during the statutory period, wherein—
>
> > (1) such owner is not a party to a lease with any of the Defendants for such interest; and
> >
> > (2) such natural gas mineral estate was at least partially situated within a "drilling unit," as set forth in 25 Pa. Code § 79.1; and
> >
> > (3) one or more Defendants extracted natural gas from such drilling unit; and
> >
> > (4) Defendants failed to pay such persons for those persons' *pro rata* shares of the natural gas extracted from such drilling unit (the "Class").

## IV.    ARGUMENT

Plaintiffs must satisfy Federal Rule of Civil Procedure 23(a) to obtain class certification. Plaintiffs must also satisfy Rule 23(b)(2) for (i) an accounting and (ii) declaratory and injunctive relief and Rule 23(b)(3) for monetary relief. For the reasons set forth below, class certification is appropriate under each of these rules.

### A.  The Class satisfies the requirements of Rule 23(a).

Rule 23(a) is satisfied when (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). The proposed Class meets each of these elements.

### 1.  23(a)(1): The Class satisfies numerosity.

Numerosity exists when a proposed class is so numerous that joinder is impracticable. *Id.* There is no minimum number of plaintiffs required to form a class, but "a plaintiff in this circuit can generally satisfy Rule 23(a)(1)'s numerosity requirement by establishing 'that the potential number of plaintiffs exceeds 40.'" *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 486 (3d Cir. 2018) (quoting *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)).

As an initial matter, Defendants removed this action to federal court under the Class Action Fairness Act. *See* ECF No. 1, at 4-8. The Class Action Fairness Act confers jurisdiction on this Court so long as, among other requirements, the proposed class has at least 100 members. *See id.* at 4. By definition, Defendants conceded in their Notice of Removal that, based on Plaintiffs' proposed class definition in their Complaint[6] and based upon a review of Defendants' records, the proposed Class satisfies CAFA's "100-member" requirement. *See id.* at 8.

Additionally, the contents of the more than 20 million records EQT produced composing the Database reveal at least 5,455 class members. *See* Ex. 8, Haney Report, at 2, 9, 13. The potential number of class members thus exceeds 40, and does so by more than 5,000. Numerosity is satisfied. *See Mielo*, 897 F.3d at 486.

### 2.  23(a)(2): The Class satisfies commonality.

Commonality exists when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Specifically, "[w]hat matters to class certification is not the raising of common questions—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*,

---

[6] The Class is identified and described in several paragraphs of the Complaint. *See, e.g.*, ECF 1-1, ¶¶ 1, 4, 5, 18-22. The Class definition has been refined from those allegations and stated in the foregoing text of this brief. *See* § III, *supra*.

564 U.S. 338, 350 (2011) (emphasis original). Meaning, the class's claims "must depend upon a common contention… capable of classwide resolution" and a "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. Notably, "even a single common question will do" to satisfy commonality under Rule 23(a)(2). *Id*. Commonality is satisfied here.

A classwide proceeding will resolve each class members' claims against EQT in a single stroke. EQT's liability to each proposed Class member turns on whether EQT has extracted natural gas from Class members without accounting to and/or compensating the Class members. The answer will either be yes or no, and is legally dispositive because EQT, as a matter of law, is strictly prohibited in Pennsylvania from extracting natural gas without paying owners their Guaranteed Payments. *See, e.g.*, 58 P.S. § 33.3; *McIntosh v. Ropp*, 82 A. at 954-55. This "yes or no" or "true or false" answer can be derived by reference to shared evidence. That shared evidence is EQT's own reliable and meticulous records produced in this action, which have been populated into Mr. Haney's interactive Database. *See* Ex. 8, Haney Report, at 9.

Factually, each Class member shares a common factual question that leads to a single, common answer. For example: Has EQT extracted natural gas without accounting to and compensating the Class members? The available evidence in this case supplies a common answer: "yes." Legally, each Class member shares a common question that leads to a single, common answer: Are the Class members entitled to be compensated under Pennsylvania law for the natural gas EQT extracted? The answer is a resounding, collective "yes."

Commonality is satisfied. *See Wal-Mart Stores, Inc*., 564 U.S. at 350.

### 3.  23(a)(3): The Class satisfies typicality.

Typicality exists when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality "ensures the interests of the class and the class representatives are aligned 'so that the latter will work to benefit the entire class through the pursuit of their own goals.'" *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 427-28 (3d Cir. 2016) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 182-83 (3d Cir. 2001)). Courts assess typicality by analyzing "the attributes of the proposed representatives, the class as a whole, and the similarity between the proposed representatives and the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 597 (3d Cir. 2009).

The analysis involves three factors. First, "the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory." *Id.* Second, "the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation." *Id.* Third, "the interests and incentives of the representative must be sufficiently aligned with those of the class." *Id.* Each of these is met here.

First, Mr. Ross and Fieldstone's claims share the same material facts and advance the same legal theory as the members of the proposed Class. Factually, Mr. Ross and Fieldstone are co-tenants of tenancies in common – the Ross and Fieldstone Properties, respectively – situated in Units from which EQT has extracted natural gas, but for which EQT has failed to provide an accounting or compensation as required under Pennsylvania statutory and common law. *See* Declarations of Richard A. Ross and Ian Dupre of Fieldstone, *supra*. That is the exact factual

circumstance of each proposed Class member. *See* ECF No. 1-1, ¶ 44 (Class definition); *see also* § III ("The Proposed Class"), *supra*.

Second, neither Mr. Ross nor Fieldstone are subject to unique defenses that are inapplicable to many Class members and likely to become a major focus of this litigation. While EQT has signaled that it will raise a makeweight defense of champerty to Fieldstone's claims (*see* ECF Nos. 118, 119), that threat should have no consequence because the threatened champerty defense fails on its face for the reasons set forth in Plaintiffs futility arguments in their opposition to EQT's motion for leave to amend its answer and affirmative defenses, which are incorporated as if fully set forth herein. *See* ECF No. 123.

Third, Mr. Ross and Fieldstone share the same interests and incentives as the members of the proposed Class. The claims of Mr. Ross, Fieldstone, and each Class member will all rise or fall together. As discussed under the analysis of commonality, an affirmative answer to whether EQT has extracted natural gas on Mr. Ross, Fieldstone, and each Class member's respective properties will lead to the same result: EQT's liability to them under Pennsylvania statutory and common law. Mr. Ross and Fieldstone share every interest and incentive of the Class they seek to represent.

Additionally, and as will be further discussed in the analysis of 23(b)(4), Mr. Ross and Fieldstone have already demonstrated their commitment to these shared interests. Mr. Ross and Fieldstone have actively engaged in the litigation since its inception and allowed themselves to be deposed in this case. *See, e.g.*, Declaration of Richard A. Ross, ¶ 17; Declaration of Ian Dupre, ¶ 14. Mr. Ross and Fieldstone recognize what is apparent: Their claims are typical of the proposed Class.

Mr. Ross, Fieldstone, and the members of the proposed Class have experienced the same injustice – a lack of accounting and payment – at the hands of the same wrongdoer – EQT. All of

this has transpired under the same legal framework – Pennsylvania statutory and common law. At bottom, Mr. Ross and Fieldstone challenge the same unlawful conduct under factual and legal circumstances typical of the members of the Class. *See Neal v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) ("[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement[.]").

Mr. Ross and Fieldstone's claims are typical of the Class. Typicality is satisfied.

### 4. 23(a)(4): The Class satisfies adequacy.

Adequacy exists when "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy serves to "uncover conflicts of interest between named parties and the class they seek to represent." *In re Suboxone Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020). The class representative need only "have a minimal degree of knowledge about the case." *Id*. Accordingly, "[o]nly fundamental conflicts will defeat the adequacy requirement." *Id*.

Adequacy under Rule 23(a)(4) also addresses the adequacy of class counsel, who must be "experienced and qualified to prosecute the claims on behalf of the entire class." *Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). The court determines adequacy of class counsel by considering (1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The class representatives and class counsel satisfy adequacy here.

**Class Representatives**. Mr. Ross and Fieldstone have been, and will continue to be, adequate representatives of the Class. Mr. Ross and Fieldstone have participated in the litigation

since its inception. *See, e.g.*, Declaration of Richard A. Ross, ¶ 17; Declaration of Ian Dupre, ¶ 14. Mr. Ross and Fieldstone have actively engaged with case material and have verified extensive discovery throughout the litigation. *See id*. Both Mr. Ross and Fieldstone have sat for depositions in this case. *See id*. Mr. Ross and Fieldstone have been exemplary class representatives, and there is no indication that they have or will act against the interests of the Class. Adequacy of the class representatives is satisfied.

**Class Counsel**. Plaintiffs are requesting the appointment of William Pietragallo, II, of Pietragallo Gordon Alfano Bosick & Raspanti, LLP, as lead counsel for the Class. Mr. Pietragallo and his firm are qualified for this appointment.

Since August 2024, Mr. Pietragallo and his law firm have associated with co-counsel Raines Feldman Littrell LLP, Quinn Logue LLC, and Keller Postman to identify, investigate, and analyze the facts and law underlying this putative class action. *See* Declaration of William Pietragallo, II. Undersigned co-counsel are very familiar with these efforts and agree that they have played a crucial role in the continued development of this matter. *See* Declaration of Scott M. Hare.

Mr. Pietragallo and his firm's litigation experience is vast and includes a history of successfully litigating class actions and complex litigation for plaintiffs and defendants alike, including as lead class counsel in *Carol Rougvie, Marguerite Sinkler Gilder, Carolien Mansour, Melinda Mehigan, Fonda Kubiak, Kara Bell and Tiffany Bolton v. Ascena Retail Group, Inc., d/b/a Justice Stores and Tween Brands, Inc., d/b/a Justice Stores*, United States District Court for the Eastern District of Pennsylvania, No. 2:15-cv-00724, MDL Docket No. 2646. Mr. Pietragallo and his firm's extensive experience in complex litigation is further detailed in his Declaration and the resumes attached thereto. *See generally* Declaration of William Pietragallo, II.

Adequacy of Class counsel is satisfied.

**B.  The Class satisfies the requirements of Rule 23(b)(2).**

As a preliminary matter, this Court should certify the Class under Rule 23(b)(2). The Class deserves declaratory and injunctive relief because EQT has engaged – and continues to engage – in a specific course of conduct that adversely affects the Class as a whole. Specifically, EQT systematically fails to provide an accounting to the Class members relating to their rights to compensation for the natural gas EQT extracts from their shared property.

The 23(b)(2) theory of liability is uniform and straightforward. When a natural gas producer executes a lease with a co-tenant, the producer steps into the shoes of the leasing co-tenant and must honor the rights of the other co-tenants who have not entered leases with it. *See Tex. Keystone Inc. v. Pa. Dep't of Conservation and Nat. Res.*, 851 A.2d 228, 237 n.12 (Pa. Commw. Ct. 2004) ("It is of course axiomatic that an assignee 'stands in the shoes' of the assignor and assumes the rights of the assignor."). Thus, the natural gas producer – here, EQT – must honor the legal obligations of the assignor co-tenant with whom it has contracted. That means that EQT must protect the rights of the other co-tenants as if EQT was a co-tenant itself. *See id*. EQT systematically fails to do so.

Each co-tenant must account to the other co-tenants for their respective *pro rata* shares of income generated through the property, including through the extraction of natural gas. *See McIntosh v. Ropp*, 82 A. 949, 955 (Pa. 1912) (holding that co-tenants must account to other co-tenants for the profits derived from the extraction of mineral rights because Pennsylvania law "recognizes such a right where minerals are held in common; and it is settled in this state that oil and gas contained in or obtainable through the land are minerals[.]"). EQT's corporate designee Patrick Corcoran acknowledged that EQT must account for the interests of unleased owners. *See*

Ex. 2, Corcoran Tr., at 379:06-08 ("[W]e owe a duty to account for them [unleased owners.]"). Under Pennsylvania law, "it shall be lawful for any one or more of said tenants in common, not in possession, to sue for and recover from such tenants in possession his or their proportionate part of the rental value of said real estate." 68 P.S. § 101. Section 101 thus provides a co-tenant with the right to enforce an accounting of its interest in natural gas extracted from real property. *See KEM Resources, LP v. Deer Park Lumber, Inc.* ("*KEM*"), 310 A.3d 142, 147 (Pa. 2024).

"A claim under Section 101 has two requirements: '(1) the complaining party must show he is not in possession of the premises and (2) it must be shown that the remaining tenant[-]in [-]common occupies exclusive possession of the premises.'" *Id*. at 152 (quoting *Sciotto v. Sciotto*, 288 A.2d 822, 823-24 (Pa. 1972)).

Pennsylvania courts define "exclusive possession" broadly: It exists where one co-tenant "alone occupied the property and exercised the rights of an owner such as making repairs and changes to suit his convenience without consulting the others." *Sciotto*, 288 A.2d at 824; *see also KEM*, 310 A.3d at 152-53. EQT, by drilling, operating, and selling gas from common property after leasing with only a subset of co-tenants, indisputably exercise those exclusive rights. *See* Ex. 2, Corcoran Tr., at 30, 52-53, 58-59, 68, 208-10 (EQT drills after leasing at least ███████ of interests and withholds payment to the rest of the interest holders).

Enter Rule 23(b)(2). Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). It "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id*. at 360-61.

Plaintiffs' requested Rule 23(b)(2) relief is precisely the type of uniform, structural relief that *Wal-Mart* permits. Plaintiffs seek a declaration that EQT, once it takes possession of a

fractional natural gas interest via a lease with fewer than all co-tenants, owes an accounting to all-co-tenants who are out of possession. Relatedly, Plaintiffs seek an injunction prohibiting EQT from continuing its admitted practice of withholding an accounting pending execution of a lease with the unleased co-tenants. *See* 68 P.S. § 101 (authorizing out-of-possession co-tenants to demand an accounting from the co-tenant in exclusive possession); *KEM*, 310 A.3d at 152-53 (recognizing a tenant-in-common's right to sue a co-tenant in exclusive possession for its proportionate share of proceeds from the property).

The requested declaration and injunction operate classwide "in one stroke" because EQT's challenged practice refusing to compensate unleased owners, until the unleased owners sign a lease with it, is a uniform practice affecting all Class members. *See* Ex. 2, Corcoran Tr., at 30, 52-53, 58-59, 68, 208-10 (testifying EQT typically leases at least ███████ of ownership before drilling and does not pay the others absent a lease); Ex. 7, Peck Tr., at 34-35 (admitting EQT will only account if it is able to come to an agreement with an owner).[7]

This Court should certify the Class under 23(b)(2), declare that EQT's business practice of withholding an accounting absent a lease with EQT is unlawful, and require that EQT provide an accounting to unleased co-tenants of the fair market value of the natural gas that EQT has extracted and continues to extract from the Class members' property.

### C.  The Class satisfies the requirements of Rule 23(b)(3).

The Court should also certify the Class under Rule 23(b)(3).

---

[7] The monetary consequences of that practice (take the gas, ask for permission later, wait until a lease is obtained, and hold owner money until the owner is leased) are reserved for the Rule 23(b)(3) class and have no bearing on the certification of a Rule 23(b)(2) class seeking purely declaratory and injunctive relief.

For a class to be certified under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The class must also satisfy the "implicit" requirement of "ascertainability," which is "narrow" and "only requires the plaintiff to show that class members can be identified." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 165 (3d Cir. 2015).

### 1. The Class satisfies predominance.

Predominance is related to commonality under Rule 23(a)(2) but is a more demanding inquiry. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Predominance "asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id*. (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, at 123-24 (3d ed. 2005) (footnotes omitted)). Ultimately, predominance will be satisfied where "the moving party... show[s] that the 'essential elements of the class's claims can be proven at trial with common, as opposed to individualized, evidence.'" *Taha v. Cty. of Bucks*, 862 F.3d 292, 308 (3d Cir. 2017). Predominance is satisfied here.

The same evidence and legal conclusions derived therefrom predominate over the entire Class. As detailed in the Rule 23(a)(2) commonality analysis, *supra*, the same answer to the same questions will decide **every Class member's claims** against EQT under Pennsylvania statutory

and common law. EQT either has or has not extracted natural gas from unleased, uncompensated owners, which can be surmised from EQT's own detailed records and from basic statistical and title tools readily available in this matter. *See generally, e.g.*, Ex. 1, Davis Report; Ex. 8, Haney Report; ECF No. 111-2 (Expert Report of John Whipkey). Once the Court references this collective, comprehensive data, it can answer, in a single stroke, whether EQT is liable to the entire Class under the common law claims and Pennsylvania's Guaranteed Minimum Royalty Act. Whether EQT extracted natural gas without paying the natural gas mineral estates' owners is black and white and does not require individualized inquiries among the 5,455 Class members.

### a.  The Class shares a uniform damages model.

Moreover, Rule 23(b)(3) requires that Plaintiffs' proposed damages model "measure only those damages attributable to" Plaintiffs' theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). Here, Plaintiffs' theory is that EQT produced natural gas from co-owned acreage while failing to account to and pay unleased co-tenants what Pennsylvania law entitles them to receive: their *pro rata* shares of the net proceeds of the production on the property (i.e., 100 percent fair market value) or a 12.5 percent royalty, whichever is greater. *See* 58 P.S. § 33.3; *McIntosh*, 82 A. at 954-55 (nonconsenting co-tenants are owed their proportionate value of extracted minerals). EQT has those numbers.

EQT already calculates, tracks, and accrues those very unpaid amounts (albeit at an impermissible 80 percent discount that can be corrected by simply multiplying the value by 5) – owner-by-owner, parcel-by-parcel – in its suspense ledgers and financial liability accounts. *See* Ex. 3, Gabbianelli Tr., at 175-76 (testifying that EQT records unleased owners as a liability and "has the financial means to pay them out if and when appropriate"); Ex. 8, Haney Report, at 15-18 (explaining that EQT's own formula admits $▮▮▮▮▮▮ in accrued but unpaid royalties). And

Mr. Haney's model applies EQT's own royalty/payment methodology across EQT's own data to generate each unpaid owner's number. *See id*. Because that methodology directly measures the monetary relief required by Plaintiffs' liability theory, damages are provable on a classwide basis consistent with *Comcast*.

### b. Any individualized defenses would not undermine predominance.

Plaintiffs anticipate that EQT may attempt to argue that individualized defenses, such as application of the statute of limitations, the defense of laches, or champerty, may undermine predominance and thus the suitability of a Rule 23(b)(3) Class here. *See* ECF No. 17 (EQT's Answer and Affirmative Defenses), ¶¶ 5-16, 19-21. The Court should reject that contention.

Any individualized limitations or laches defenses can be addressed at the remedies or claims administration phase; they do not overwhelm the core merits issue (EQT's practice of producing natural gas without accounting/payment). *See Tyson Foods v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (predominance is satisfied where "one or more of the central issues in the action are common to the class and can be said to predominate… even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members")

Moreover, and as detailed under the typicality analysis, *supra*, EQT's threat of a champerty defense is baseless. But even if it were not baseless (which it is), the champerty accusation is only lodged at Fieldstone and not Mr. Ross. So even if a champerty defense predominated against Fieldstone, and Fieldstone's claims were defeated, the Class would retain Mr. Ross as a typical, adequate representative, and his adequacy alone is sufficient to secure class certification. *See In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d at 428 (typicality looks to whether the representatives' interests are aligned with the class, not whether each representative is

invulnerable to every defense); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) ("[F]actual differences between the proposed representative and other members of the class do not render the representative atypical 'if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members.'")

Ultimately, the "common, aggregation-enabling" issues predominate here.

Predominance is satisfied.

### 2. The Class satisfies superiority.

Superiority exists when a class action is superior, "in terms of fairness and efficiency," to "alternative available methods of adjudication." *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d 380, 408 (3d Cir. 2015). The Court considers "a non-exhaustive list of factors to consider in determining superiority, including: (1) the class members' interest in individually controlling the prosecution of separate actions; (2) the extent and nature of any similar litigation already commenced by class members; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Id*. at 408-09 (citing Fed. R. Civ. P. 23(b)(3)). Superiority is met here.

First, the Class members likely lack an incentive to control the prosecution of the more than 5,000 smaller actions. It is also likely that not all Class members, or even many of them, are aware of the claims they have against EQT for EQT's failure to pay them what they are owed under Pennsylvania law. Additionally, many owners' monthly payment accrual is likely too small to justify individual counsel, expert landmen, and gas-accounting analysis required in a lawsuit like this. Class actions remedy this "negative-value suit" problem, and the prospect of a negative-value suit in the absence of class certification here supports superiority. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism

is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (citation omitted).

Second, to counsel's knowledge, similar litigation is not pending against EQT in Pennsylvania.

Third, it is highly desirable to concentrate this action in a single forum. The action affects more than 5,000 unleased, uncompensated property owners whose property EQT has taken without payment. EQT operates a sophisticated, large-scale business that involves the generation of tens of millions of records populated by various fields of data. *See generally* Ex. 8, Haney Report. While that data can be – and has been – simplified and accessible to a statistical expert like Mr. Haney, requiring each individual Plaintiff to request, comb through, and decipher that data would be an overwhelming burden to the individual, especially where, as here, the same applicable facts and law predominate over the entire Class.

Moreover, certifying the Class for classwide adjudication in this forum will prevent potentially inconsistent rulings on core legal questions. *See In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 323 n.5 (3d Cir. 2019) ("[A] class action may be maintained" if "prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members.'") (quoting Fed. R. Civ. P. 23(b)(1)(A)). Without class treatment, different courts could adopt inconsistent answers to the same legal questions. Does 68 P.S. § 101 obligate a producer-lessee to account to non-signing co-tenants? Does withholding payment unless/until a lease is signed violate Pennsylvania common law? Can EQT avoid the Minimum Royalty Act by leasing with only some co-tenants while taking and producing everyone's gas? Rule 23(b)(3) was designed to foster uniform answers to these types of question, which it will do here by the Court certifying the Class.

Fourth, resolution of these matters on a classwide basis promotes simplicity and efficiency of management. The evidence has been, and will continue to be, collected, analyzed, and synthetized by qualified counsel and qualified experts. The synthetized evidence can be referenced by the Court to answer, in a single stroke, the predominate factual and legal questions that will resolve the claims of all Class members. Adjudication of these claims on a classwide basis will thus reduce difficulties of management for the Court and the Class members, not increase them.

Superiority is satisfied.

### 3. The Class satisfies ascertainability.

"The ascertainability inquiry is two-fold, requiring a plaintiff to show that (1) the class is 'defined with reference to objective criteria' and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'" *Byrd*, 784 F.3d at 163 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013)). "The ascertainability requirement consists of nothing more than these two inquiries. And it does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members *can* be identified.'" *Id.* (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)) (emphasis in original). A key question is whether "extensive and individualized fact-finding or mini-trials" will be necessary to identify the Class members. *See In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 795 F.3d at 396. If not, the evidence weighs in favor of ascertainability. *See id*. Here, the Class is ascertainable.

### a. The Class is defined using objective criteria.

The Class is defined with reference to objective criteria. Broken down, the Class covers persons, natural or fictitious:

(1) who owned a real property interest in a natural gas mineral estate;

(2) in Pennsylvania;

(3) during the statutory period;

(4) where such owner is not a party to a lease with any of the Defendants for such interest;

(5) where the natural gas mineral estate was at least partially in a "drilling unit" as defined by Pennsylvania law;

(6) where one or more of the Defendants extracted natural gas from the drilling unit; and

(7) where Defendants have failed to pay such persons for their *pro rata* share of the natural gas extracted from the drilling unit.

Each of these criteria is objective. A person either owns a given property or does not. The Class does not contemplate "nice" property, "handsome" property," "valuable" property, or "expensive" property. It contemplates real property, the ownership of which is an objective "yes or no" inquiry which can be determined, at least in substantial part, by EQT's own records.

To that end, EQT stores and maintains all leases, and the details thereof, and those leases identify details of the property from which EQT extracts natural gas. *See* Ex. 2, Corcoran Tr., at 27, 33, 39. Those properties indicate, among other things, where the property is located, the owners of natural gas interests in the property, production details for the property, and whether EQT has accounted or provided payment to those owners. EQT stores this information in a "Salesforce" database and has produced the data in this action. *See, e.g.*, *id*.; Ex. 8, Haney Report, at 9. EQT therefore has provided data to objectively ascertain the members of the Class based on the proposed Class definition.

The Class is defined with objective criteria.

   **b. Mr. Haney's interactive database, supplemented by standardized tools of title, provides a reliable and administratively feasible mechanism to ascertain class membership.**

A reliable and administratively feasible mechanism exists to identify the Class members, as detailed by Mr. Haney in his expert report. That mechanism is a single, interactive Database built with EQT's own undisputed data. And to the extent any finishing touches are needed to finalize the composition of Class membership beyond Mr. Haney's Database, title expert Cara Davis, who has issued her own report consistent with the report of former Plaintiff title expert John Whipkey, has explained how Class membership may be identified using basic, ordinary, and standardized tools of title, of the sort that professionals like her, Mr. Whipkey, and BOP Abstract, EQT's own title vendor, use every day. To that end, even EQT's own rebuttal title expert, Jesse Zirillo, has acknowledged under oath that these tools are the standard tools of title. *See* Ex. 9, Dep. Tr., Jesse Zirillo ("Zirillo Tr."), at 40:22-41:09 ("Q: And when you do your title searches, do you do the things that are mentioned there, additional title research, searches of public records, online resources? Do you use those tools? A: Yes. Yes, I do. Q: Does everybody who does title work in the gas and oil world use those very same tools? A: I can't answer to what everybody in the oil and gas world does, but I would assume they do.").

   As a foundational matter, no party, including EQT, disputes that EQT's voluminous internal data are reliable. *See* Ex. 7, Peck Tr., at 24. Plaintiffs accept that EQT is not profiting billions of dollars through a practice of fabricating its own data, and unless EQT wishes to contest otherwise, the data that EQT provided in this action about natural gas production, accounting, and ownership are reliable.

   Crediting EQT's data as reliable, Plaintiffs retained veteran statistical and title experts to explain what can be learned and ascertained from EQT's data. The statistical expert, Christopher

Haney, compiled EQT's data into a single, interactive Database. *See* Ex. 8, Haney Report, at 9. That database can already be searched to locate, with 95 percent confidence, identifying information for 68 to 81 percent of those falling within the Class definition. *See id*. at 14-15. At present, without further information that will inevitably come out in the lead up to, and during, trial, a significant majority of the Class not only **can** be reliably and feasibly identified – which is all that ascertainability requires – but in fact **has already been identified**. *See Byrd*, 784 F.3d at 163 (emphasis added).

Any remaining minority of Class members can be identified using standardized tools of title. Title examiners such as Ms. Davis can take any parcel of land – all EQT parcels are identified in EQT's records – and trace remaining interests in the parcels to identify any unidentified Class member. *See generally* Ex. 1, Davis Report; *see also* ECF No. 111-2 (Whipkey Report). The mechanism of title searching is not individualized but rather common, feasible, and reliable. *See* Ex. 1, Davis Report, at 4. The practice is so uncontroversial that Ms. Davis, Mr. Whipkey, Mr. Zirillo, and EQT's own Pennsylvania title vendor, BOP, agree that title examiners draw from the same standard toolbelt – which includes county land records and online, publicly available ancestry and genealogically resources – to identify property owners for a given parcel of land. *See* Ex. 1, Davis Report, at 4; ECF No. 111-2, at 2-5 (Whipkey Report); Ex. 9, Zirillo Tr., at 40:22-41:09; Ex. 5, BOP Tr., at 132. EQT's top land official, Corey Peck, agrees that there is no better way to conduct this work than through these methods. *See* Ex. 7, Peck Tr., at 26-27.

In sum, the Court need to look no further than these key points to recognize the reliability and feasibility of the mechanism of ascertaining the Class:

- EQT, through vendors like BOP Abstract, already performs title and heirship research pre-production to locate owners. And EQT requires accurate ownership information as

a contractual deliverable from BOP Abstract. *See* Ex. 5, BOP Tr., at 56, 73; Ex. 6, EQT-BOP MSA, § 7.10)

- EQT's top land officer testified that there is no "better" way to identify landowners than the processes EQT employs. *See* Ex. 7, Peck Tr., at 30. In other words, standardized title work is reliable and feasible to identify owners.

- Mr. Haney's database already captures at least 5,455 unique unleased and uncompensated owners of natural gas that EQT has extracted in Pennsylvania, and can already identify 68-81 percent of those owners in one sitting with 95 percent confidence. *See* Ex. 8, Haney Report, at 9, 13-15.

- The combination of Mr. Haney's database with the standardized, reliable, and feasible mechanism of title work vouched for by competent title practitioners like Ms. Davis, Mr. Whipkey, and EQT's own vendor BOP Abstract demonstrate that the Class members are capable of identification, which is all that ascertainability requires

The Plaintiffs' proposed mechanism to ascertain Class members is thus reliable and feasible, and EQT's own conduct in the ordinary course of business, regardless of what they may now try to claim to defeat this motion, reflects that.

And to the extent a residual handful of fractional interest owners cannot be located despite diligent efforts, Pennsylvania law supplies an orderly mechanism to fill in the gap. *See* 58 P.S. § 701.4(a). Under Pennsylvania's Dormant Oil and Gas Act ("DOGA"), "[a]ny person [including an operator] who owns an interest in oil and gas underlying a tract of land may petition the appropriate division of the court of common pleas of the county in which the tract or any portion of the tract is located to declare a trust in favor of all unknown owners of an interest in the oil and gas underlying the tract whose identity, present residence or present address is unknown and

cannot be determined by diligent efforts." *Id*. This backstop allows the Court to create the DOGA trust or instruct EQT to file the contemplated petition(s) under DOGA to fulfill its duty to provide payment to all owners. Class membership is thus capable of complete ascertainment.

Ascertainability is satisfied.

## V.    CONCLUSION

EQT admits that it is holding money that belongs not to EQT but to unleased natural gas owners. Those unleased natural gas owners come forward in this class action, and respectfully request that the Court certify them as a Class to receive the accounting and money owed to them by EQT under Pennsylvania law.

Respectfully submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

*/s/ William Pietragallo, II*
William Pietragallo, II
PA ID: 16413
412-263-1818
wp@pietragallo.com
P. Brennan Hart
PA ID: 18123
412-263-4347
pbh@pietragallo.com
Matthew R. Barnes
PA ID: 328771
412-263-1842
mrb@pietragallo.com
One Oxford Centre, Floor 38
Pittsburgh, PA 15219

*Counsel for Plaintiffs*

RAINES FELDMAN LITTRELL LLP
Scott M. Hare
PA ID: 63818
412-899-6454
share@raineslaw.com
Anthony T. Gestrich
PA ID: 325844
412-899-6494
agestrich@raineslaw.com
11 Stanwix Street, Suite 750
Pittsburgh, PA 15222

QUINN LOGUE LLC
Matthew T. Logue
PA ID: 87416
412-765-3800
matt@mattlogue.com
200 First Avenue, Third Floor
Pittsburgh, PA 15222

KELLER POSTMAN LLC
Alex J. Dravillas (*Pro Hac Vice*)
ajd@kellerpostman.com
312-948-8474
150 N. Riverside Plaza, Suite 4470
Chicago, IL 60606

*Co-counsel for Plaintiffs*